**EATON et al. v. R. B. GEORGE INVESTMENTS, Inc.**

No. 14551.

Court of Civil Appeals of Texas. Dallas.

Nov. 28, 1951.

Rehearing Denied Dec. 26, 1952.

Roland Boyd and Ed. Veigel, McKinney, Robertson, Jackson, Payne, Lancaster & Walker and Otis Gary, Dallas, for appellants.

Leachman, Matthews & Gardere, and Henry D. Akin, Dallas, for appellee.

CRAMER, Justice.

Mrs. Eaton, joined pro forma by her husband F. W. Eaton, filed this suit in the trial court against R. B. George Investments, Inc., to recover damages growing out of the death of Ginger Dale Ensley, the

three-year-eight-months-old daughter of Mrs. Eaton, who was found dead in a dipping vat on the R. B. George Investments, Inc. farm in Dallas.

The parties will be designated as in the trial court. The plaintiffs' pleadings alleged that the vat and its surrounding fences, etc., were attractive to children, and then followed in separate paragraphs four specific acts of negligence alleged to have been the proximate cause of the child's death, and prayed for damages of $15,072.50, costs, interest, etc.

The following plat and picture (among others) of the premises involved were introduced in evidence, to wit:

At the close of the evidence the defendant moved for an instructed verdict which was refused. The case was then submitted to the jury who, in answer to special issues, found: (1) Ginger was drowned in the dipping vat in question; (1-a) that the white fences and chute in question were not unusually attractive to children such as Ginger (other issues dependent on 1-a were not answered according to the court's instructions); (8) that the failure of defendant, its agents, etc., to warn plaintiffs of the existence of the dipping vat was negligence; (9) which proximately caused Ginger's death; (10) that defendant and its servants, agents and employees were negligent in failing to place a protective covering over the dipping vat which proximately caused Ginger's death; (15) defendant was not negligent in failing to place a gate handle or construction of some kind in the chute extending from one side to the other at the end of the vat.

The verdict exonerated the child and parents from contributory negligence, and further found the death was not an unavoidable accident. Actual damage to Mrs. Eaton was found to be $11,597.50.

In our opinion the full charge should be shown in order to clearly show the full effect of the points of both parties and is therefore shown in full in note [1] below.

1. "(1) Do you find from a preponderance of the evidence that the white fences and chute in question which led to the dipping vat in question were unusually attractive to children such as Ginger Dale Ensley? Answer 'Yes' or 'No.' Answer No. If you have answered question No. 1 'Yes,' then you will answer question No. 2; otherwise do not answer question No. 2.

"Question No. 2. Do you find from a preponderance of the evidence that the defendant, R. B. George Investments, Inc., its servants, agents and employees should have foreseen that the white fences and chute in question which led to the dipping vat in question were unusually attractive to children such as Ginger Dale Ensley? Answer 'Yes' or 'No.' Answer ———. If you have answered question No. 1 'Yes,' then you will answer question No. 3; otherwise do not answer question No. 3.

"Question No. 3. Do you find from a preponderance of the evidence that the white fences, chute and vat in question herein were dangerous to children such as Ginger Dale Ensley? Answer 'Yes' or 'No.' Answer ———. If you have answered question No. 3 'Yes,' then you will answer question No. 4; otherwise do not answer question No. 4.

"Question No. 4. Do you find from a preponderance of the evidence that the child, Ginger Dale Ensley, did not understand that the white fences, chute and vat in question were dangerous? If you so find from a preponderance of the evidence, let the form of your answer be: 'She did not understand that they were dangerous'; otherwise let the form of your answer be: 'She did understand that they were dangerous.' Answer ———. If you have answered question No. 1 'Yes,' then you will answer question No. 5; otherwise do not answer question No. 5.

"Question No. 5. Do you find from a preponderance that Ginger Dale Ensley on or about July 6, 1949 was attracted by said white fences and chute which led to the vat in question? Answer 'Yes' or 'No.' Answer ———. If you have answered question Nos. 1, 2, and 3 'Yes,' then you will answer question No. 6; otherwise do not answer question No. 6.

"Question No. 6. Do you find from a preponderance of the evidence that the defendant, R. B. George Investments, Inc., its servants, agents and employees, were negligent in permitting such white fences, chute and vat in question to be on the premises under the existing circumstances on or about July 5, 1951? Answer 'Yes' or 'No.' Answer ———. If you have answered question No. 6 'Yes,' then you will answer question No. 7; otherwise do not answer question No. 7.

"Question No. 7. Do you find from a preponderance of the evidence that such negligence, if any you have found, was a proximate cause of the death of Ginger Dale Ensley? Answer 'Yes' or 'No.' Answer ———.

"Question No. 8. Do you find from a preponderance of the evidence that the failure of R. B. George Investments, Inc., its servants, agents and employees to warn Mr. and Mrs. Eaton of the existence of the dipping vat in question was negligence, as that term has been defined herein? Answer 'Yes' or 'No.' Answer Yes. If you have answered question No. 8 'Yes,' then' you will answer question' No. 9; otherwise do not answer question No. 9.

"Question No. 9. Do you find from a preponderance of the evidence that such negligence, if any you have found, was

The court overruled plaintiffs' motion, and sustained defendant's motion for judgment and entered a take nothing judgment in favor of defendant, finding as a basis therefor that:

" * * * the white fences and chutes in question which lead to the dipping vat in question were not un-usually attractive to children such as Ginger Dale Ensley, which took out of the case the element of an implied invitation from defendant to Ginger Dale Ensley to enter the portion of the premises where the dipping vat was located, without which implied invitation the said Ginger Dale Ensley was

a proximate cause of the death of the child, Ginger Dale Ensley? Answer 'Yes' or 'No.' Answer Yes.

"Question No. 13. Do you find from a preponderance of the evidence that the failure of the defendant, R. B. George Investments, Inc., its servants, agents and employees to place a protective covering over the dipping vat in question herein was negligence as that term has been defined herein? Answer 'Yes' or 'No.' Answer Yes. If you have answered question No. 13 'Yes,' then you will answer question No. 14; otherwise do not answer Question 14.

"Question No. 14. Do you find from a preponderance of the evidence that such negligence, if any you have found, was a proximate cause of the death of the child, Ginger Dale Ensley? Answer 'Yes' or 'No.' Answer Yes.

"Question No. 15. Do you find from a preponderance of the evidence that the failure of the defendant, R. B. George Investments, Inc., its servants, agents and employees, to place a gate, panel, or construction of some kind in the chute extending from one side to the other at the east end of the dipping vat was negligence, as that term has been defined herein? Answer 'Yes' or 'No.' Answer No. If you have answered question No. 15 'Yes,' then you will answer question No. 16; otherwise do not answer question No. 16.

"Question No. 16. Do you find from a preponderance of the evidence that such negligence, if any you have found, was a proximate cause of the death of the child, Ginger Dale Ensley? Answer 'Yes' or 'No.' Answer ——.

"Question No. 17. Do you find from a preponderance of the evidence that the child, Ginger Dale Ensley, at the time and on the occasion in question failed to keep a proper lookout, as that term has been defined herein, for her own safety? Answer 'Yes' or 'No.' Answer No. (Proper lookout is defined here.)

"If you have answered question No. 17 'Yes,' then you will answer question No. 18; otherwise do not answer question No. 18.

"Question No. 18. Do you find from a preponderance of the evidence that such failure to keep a proper lookout, if you have so found, was a proximate cause or contributing cause of the accident in question? Answer 'Yes' or 'No.' Answer ——.

"Question No. 19. Do you find from a preponderance of the evidence that Mr. and Mrs. Eaton failed to keep a proper lookout, as that term is defined below, for the safety of their daughter, Ginger Dale Ensley? Answer 'Yes' or 'No.' Answer No. (Proper lookout defined here.) If you have answered question No. 18 'Yes,' then you will answer question No. 20; otherwise do not answer question No. 20.

"Question No. 20. Do you find from a preponderance of the evidence that such failure to keep a proper lookout, if you have so found, was a proximate cause or contributing cause of the accident in question? Answer 'Yes' or 'No.' Answer ——.

"Question No. 21. Do you find from a preponderance of the evidence that the failure of the plaintiffs, Mr. and Mrs. Eaton, to keep their daughter within the fenced area of their house and home was negligence, as that term has been defined herein? Answer 'Yes' or 'No.' Answer No. If you have answered question No. 21 'Yes,' then you will answer question No. 22; otherwise do not answer question No. 22.

"Question No. 22. Do you find from a preponderance of the evidence that such negligence, if you have so found, was a proximate cause or contributing cause of the accident in question? Answer 'Yes' or 'No.' Answer ——.

"Question No. 23. Do you find from a preponderance of the evidence that the plaintiff Mrs. W. F. Eaton was negligent in failing to have the yard fenced in such a manner that her child could not make an exit therefrom? Answer 'Yes' or 'No.' Answer No. If you have answered question No. 23 'Yes,' then you will answer question No. 24; otherwise do not answer question No. 24.

"Question No. 24. Do you find from a

not an invitee but was either a trespasser or mere licensee, to whom the defendant owed no duty other than not to willfully or intentionally injure her, and the findings of the jury in response to questions Nos. 8, 9, 13, 14, 25, 26 and 27 to the effect that defendant failed to exercise ordinary care for the safety of Ginger Dale Ensley proximately causing her death become wholly immaterial and are not controlling issues, since under the law the defendant did not owe the duty to such trespasser or licensee to exercise ordinary care for her safety and she was bound by the condition of the premises in which she found them. * * *." The judgment also recites that, in the alternative, defendant's motion for instructed verdict should have been granted.

Plaintiffs duly perfected this appeal from the judgment and brief two points of error, in substance: Error in not sustaining plaintiffs' motion for judgment on the verdict because, (1) " * * * the undisputed evidence showed that the deceased child was an invitee on the premises of defendant"; (2) the deceased child was an invitee on the premises of the defendant as a matter of law.

Defendant counters that the jury having found the child was not an invitee on that portion of the premises where she was found dead, under the attractive nuisance doctrine, and no other issue being pleaded or submitted to the jury or requested by appellants as to whether she was an invitee, and "there being evidence she was not an invitee, the trial court properly overruled the appellants' motion for judgment on the verdict of the jury."

It is clear from the above record that the attractive nuisance doctrine went out of the case when the jury answered special issue No. 1. The only material question raised by the points, is whether the case was submitted to the jury on two theories, one under the attractive nuisance doctrine, the other based on the theory that the child was an invitee on the premises involved, and as such invitee, the defendant owed to her the duty to exercise ordinary care.

 The rule is that all issues necessary to support the issues submitted are presumed to be found by the court in support of the judgment if there is evidence to support them. Such rule however is not applicable here since the court's judgment is for the defendant, which could not mean other than that the issue of invitee was found by the court against appellant and in support of his judgment for appellee. In this the learned trial judge was correct. The record without dispute shows plaintiff F. W. Eaton was the husband of the mother of the deceased child. That Eaton as an employee was furnished (as a part of his employment) the house in which

preponderance of the evidence that such negligence, if any you have found, was a proximate or contributing cause of the accident in question? Answer 'Yes' or 'No.' Answer ———.

"Question No. 25. Do you find from a preponderance of the evidence that the death of the child, Ginger Dale Ensley, was not the result of an unavoidable accident, as that term is defined below? If you so find from a preponderance of the evidence, let the form of your answer be: 'It was not the result of an unavoidable accident'; otherwise let the form of your answer be: 'It was the result of an unavoidable accident.' Answer. It was not the result of an unavoidable accident." (Unavoidable accident is defined here.)

"Question No. 26. Do you find from a preponderance of the evidence that Mrs.

F. W. Eaton suffered actual pecuniary loss as a proximate result of the death of her daughter, Ginger Dale Ensley? Answer 'Yes' or 'No.' Answer Yes. If you have answered the foregoing question No. 26 'Yes,' then you will answer question No. 27; otherwise do not answer question No. 27.

"Question No. 27. What sum of money, if any, do you find from a preponderance of the evidence, if paid now in cash, would reasonably compensate Mrs. F. W. Eaton for her actual pecuniary loss, if any, as a proximate result of the death of her daughter, Ginger Dale Ensley? (Instructions as to elements of damage are stated here.) Answer in Dollars, if any, and cents, if any. Answer $11,-597.50."

he and his wife and stepdaughter were making their home at the time of the death of his stepdaughter. It is undisputed that defendant's agents knew Eaton's wife and stepdaughter were living with Eaton as a family unit, in such house furnished to Eaton without deduction from his salary. It can be assumed from the evidence, however, that the house was furnished by the employer to Eaton for the benefit and convenience of both the employer and employee.

J. Lee Jackson, general overseer of defendant's farm for seven years before the accident in question, testified, material here, in substance that he had been acquainted with Mr. and Mrs. Eaton since June 1949, when Eaton applied for work and was employed by him for general farm work. The farm covers about 1,000 acres of land. The Eatons were furnished living quarters on the farm, first in the south apartment from the barn, about 225 feet from the dipping vat; later they moved to the apartment north of the barn. When Eaton couldn't work in the field, he, among others, sprayed cattle. They would run the cattle into the chute, spray them, and the cattle then went out the gate entrance to the chute. Eaton had helped spray cattle in the chute and Mrs. Eaton at one time brought out ice water. Mr. Eaton helped build one of the fences that run up to the dipping vat. The dipping vat where the cattle enter has a slight slant which becomes wet, which tends to slip them on in, and then there is a jump-off from there. On the other end there is a rough ramp on which they could walk out. There is nothing unusual about the dipping vat; he had never seen children playing around the chute or vat; didn't give permission to the deceased child to play in the pen, the chute or vat; had never had any occasion to tell Mr. Eaton about the vat; that you would have to be looking the other way if you failed to see it; the vat was hidden from the house by the chute, was constructed of concrete, and about level with the ground. It was solidly boarded up on each side approximately 36 to 40 inches so they could work the cattle from the side. He never gave Eaton permission for his children to play down there

on the part of the premises where the dipping vat was located and had no reason to suspect that he would let his children play there. Spraying has about displaced dipping. The vat is not used any more. The distance from the vat gate to the chute is 40 feet; from the chute to the vat 35 feet. The gate is 31 feet from the house bedroom door; the vat is 106 feet from the nearest door in the apartment occupied by Eaton and his family. It is 40 feet long, 3½ feet wide, and the chute 3 feet wide. At the time Eaton moved on the farm, he knew Eaton had a wife and child. He assigned the living quarters to Eaton. Before the accident he had never seen the children very far away from their mother; found no occasion to warn them; he knew that no matter how closely you watch children, they get away from you almost before you can turn around; that is their nature; the dipping vat is a trap by nature. Eaton had only worked for defendant a month before the death of the child. Jackson did not tell Eaton the yard around his house alone was his and to keep his family in that yard. "Q. It is generally accepted on a farm, when you hire farm labor, that they more or less have the run of the farm, don't they? A. Well, not—

"Q. I mean they can walk and wander around; the children, when they get older, can play where they want to? A. Not out there with the kind of situation we have got. We have to be rather careful about that, although I never warned Mr. Eaton or Mrs. Eaton that they had to keep the children within a certain space, but we have lots of traffic in and out of this place out there and we have been, since that time, so far as that is concerned, we have been rather careful about how many children were in a family that came in there, how well controlled they were.

"Q. How many families do you work out there? A. Well, there are about seven or eight families all told, including the colored.

"Q. You furnish living quarters to all of them? A. Yes, sir.

"Q. You don't expect those families to stay right within the enclosure of the par-

**196**

ticular living quarters that you furnish for them, do you? A. No, sir.

"Q. And if one goes to visit from A. to B., they are not trespassing, in your way of thinking, when they go across your land? A. No restrictions."

Eaton testified he did not know before the death of the child that there was a dipping vat out in the corrals and chutes.

In our opinion the record here did not raise an issue of fact on the question of invitee, but shows the child at the place where she met her death, was at most a licensee.

 One who, as a servant or employee, occupies with his family a house on the premises of his employer, is not a tenant, with his employer as landlord. The relationship between the parties is that of master and servant. The house furnished Eaton by his employer was not for a definite term, but was wholly subject to the tenure of the employment. Woodson v. McLaughlin, 150 Ark. 340, 234 S.W. 185; Tipsword v. Potter, 31 Idaho 509, 174 P. 133, 6 A.L.R. 527; 35 Am.Jur., sec. 84, p. 515; Fort Worth & D. C. R. Co. v. Mills, Tex.Civ.App., 140 S.W.2d 513, 515, error dis. correct judgment. As said in the R. Co. v. Mills case:

"A licensee is said to be a person whose entrance upon or use of the premises of another is permitted by the owner under such circumstances as that he is not a trespasser but is without any express or implied invitation. He, therefore, occupies a position lying somewhere between that of a trespasser and that of one who has been invited upon the premises by the owner or one having authority to extend an invitation to enter upon the same. He is on the premises by sufferance and not by virtue of any business or contractual relation with, or any enticement, allurement, or inducement to enter being held out to him by the owner or occupant, but merely in his own interest or for his own purposes, benefits, convenience or pleasure. Hicks v. Gulf, C. & S. F. Ry. Co., Tex.Civ.App., 212 S.W. 840; Mack v. Houston, E. & W. T. R. Co., Tex.Civ.App., 134 S.W. 846."

The case of Gulf Production Co. v. Quisenberry, 137 Tex. 347, 97 S.W.2d 166, and other landlord and tenant cases where rent paying tenants were involved are not in point.

For the reasons stated above, there was no error in the trial court's judgment. It is therefore

Affirmed.